Please call the next case. 112-119 Morton's Steakhouse v. Dryden, Alabama. Counsel. Very good statement. Thank you. Good afternoon. Philip Johnson representing Morton's Steakhouse. Counsel. Thank you for the privilege of being here today. As you noticed in the appeal that we filed, we were alleging that the decision of the Industrial Commission finding that the petitioner sustained a compensable incident on or about December 12, 2007 was incorrect as contrary to the manifest way of the evidence. And further, we were indicating that the decision awarding the medical expenses, additional lost time benefits and penalties under sections 19KL and returning fees under 16 was also against the manifest way of the evidence. The petitioner in this case, Mr. Brian Albizez, did on August the 5th, 2008, file an application for adjustment of claim. And in that application for adjustment of claim, he alleged that on 12-12-2007 while working, he sustained an accidental injury which arose out in the course of his employment to his left ankle. It is our position that the petitioner did not in fact sustain an accident that day. As a matter of law, by his own testimony, which occurred during the course of his testimony before the arbitrator, there is no evidence that the petitioner sustained an accidental injury which in any way was caused by his employment activities. The medical records in this case are somewhat interesting. And I can understand when the Court would first read the briefs and read the medical that there is a great deal of confusion regarding what really happened to Mr. Albizez. Mr. Albizez's records seem to indicate that he went to see his doctor for a visit on November the 7th of 2007 and he had some complaints about his right foot. And I bring that to your attention because it is relevant to the ultimate issue of whether or not the second theory of recovery in this case, cumulative trauma, should be relevant. On November 7th, the petitioner's right foot was examined and then his left foot was examined and there was no indication of any pathologies whatsoever within the petitioner's left foot or ankle. The petitioner then returned to the doctor on November 19th, 2007, at which point equally the left foot demonstrated no evidence of any injuries to the tendons or ligaments therein. The petitioner then testified that he worked for the respondent or plaintiff in this case and said that he, on November 23rd, after finishing a day's work as a waiter, went home and took his shoe off and experienced a massive amount of swelling and pain and discomfort in his foot. And subsequent to that date, he then returned to his longtime treating doctor, Dr. Gagnon, on December the 5th, I'm sorry, on December the 13th, strike that. On December the 5th, he sees the doctor following this incident of swelling. And at that time, the doctor says, and I quote, the patient presents for a cortisone injection. His chief complaint is better since the last visit. He is 100% approved in his symptoms since our last visit. He has been compliant. He did have some pain in the medial left ankle, but it is better today. I find that to be remarkably significant in my theory of the lack of compensability of this case. And the reason I find that remarkably significant is that Mr. Albizaz testified then that he returned to work and experienced the same or similar discomfort to a greater degree on or about December the 12th of 2007. This was the last date that the petitioner worked. During the course of the arbitration in this matter, petitioner's counsel says that that is the date he put on the application because that's the last date the petitioner worked. If that is in fact the case, and if in fact the theory of the plaintiff's recovery is one of cumulative trauma, how much cumulative trauma could have existed between the date of November 19th, when his left foot was described as normal in the cursory comparative examination, and December the 23rd, when he experienced this difficulty? Now, let's assume for the sake of argument that the petitioner's testimony, as enlisted by the arbitrator on page 111 of the original transcript of proceedings, is correct. The arbitrator asks the petitioner, during the course of the arbitration at page 111, he says, the arbitrator says, I have one or two questions myself. On December the 12th at work, was there any particular time of that date when you were aware of an increase in the left ankle pain? Answer. What happened is it just, I felt it just walking down the stairs. I felt this snapping, pulling feeling. It was mild. It wasn't a big jerk. But it was strange. I had never felt it before. Your Honors, that is the accident that he's talking about. That is the accident he's talking about. Oh, wait a minute. You just yourself referenced medical treatment, seeing doctors before December 12th. Exactly. The first time he had a problem wasn't on December 12th, was it? It was on November 23rd. Right. Okay. Right. And then he recovered from that. He went to the doctor and said he was fine. And then he went back to the doctor. And then he went to work. Yeah. And then he came down the stairs and he felt a pain in his ankle. How many times did he see the doctors before December 12th? Well, in 2006 substantially. But before December 12th, he saw him on November 5th, November 7th, and November 19th. All those incidents complaining of problems with his ankle? No, not with his left foot at all. No. He didn't complain about his left foot at all until November 23rd when he had this incident where he took his shoe off. Right. And then after November 23rd, did he go back to the doctor complaining about a problem? Yes. Well, it's on December the 13th he returns to the doctor. And he says the patient had previously been discharged. He states that he has swelling and pain now in the medial left ankle area. It happened a few weeks ago. But then it went away. This time it is worse and is not going away. He believes the ankle got worse at work where he does a lot of standing and walking. Well, let me ask you a very pointed question. Yes. Can all the treating and examining physicians find a causal connection between his employment duties as a waiter and his left ankle injuries? Yes, sir. So why can't the commission rely on them? Well, we'll get to that. Okay. Good. Yes, they did. But I think there's more facts here than that. The point of raising the testimony for 110 pages of transcript, he never mentioned the fact that this situation occurred when he came down the stairs at work on December the 12th. But in answer to the arbitrator's question, he says there's a specific incident there. To me, that specific incident is a controlling incident in the application for adjustment of claim. And it establishes that the petitioner was attempting to rely on a specific, finite, definite incident going down the stairs. He will deny that. I say that's the reason when he went to his lawyer's office on August the 1st of 2008 to sign the application for adjustment of claim, he specifically referenced December 12th, 2007, going down the stairs, at the stairs on page 111. But there's nothing to indicate that any factor in his employment caused that incident. So what he does now is he bootstraps his case up to say, oh, I know what it is. It's from repetitive trauma. Never mind. Go ahead. There's no application for adjustment of claim on file for November 23rd, 2007. None. So if you're going to find that it is a cumulative trauma case based upon repetitive exposure, there's no application for one. There's only an application for adjustment of claim for an incident which occurred in a finite date and time. And irrespective in going back to your statement, Your Honor, yes, the doctors say it's the result of a cumulative trauma condition from being a waiter. But there's no application for adjustment of claim on file for that. And you can't bootstrap this case up. He picked December 12th, 2012. Counsel, in response to a question by the arbitrator, said we filed that because that was the last day he worked. No. It may have been the last day he worked. But that's the day, he says to the arbitrator, that something occurred going down the stairs. Well, to prove that something happened going down the stairs establishes a compensable incident, you must prove all those factors of an increased risk. He doesn't testify he was carrying anything. He doesn't testify he slipped. He doesn't testify there was bad carpeting. He doesn't testify to a defect. He says that he felt the snapping and pulling when he went down the stairs. Now, I know that the commission is very liberal in their construction of what is and what is not. But I'm suggesting to you that pleadings are there for a reason. Applications for adjustment of claim are there for a reason. So he did not testify earlier in the evening. He experienced pain. He started to feel uncomfortable. Oh, yes, he did. His ankle began to swell, et cetera, et cetera. Oh, yes, sir, he did. He did. Yes, sir, absolutely he did. His entire premise until page 111 of the transcript where the arbitrator pinned him down was to say the arbitrator is looking at the application for adjustment of claim. And he's saying you're basically, if I'm in his head, I'm saying you said you were injured while working on December 12, 2007. That's what the arbitrator is thinking in his mind. So he looks at him and says, he says, quote, I have one or two questions. On December 12th at work, was there any particular time of that day when you were aware of the increased pain in the ankle? And he describes going down the stairs. Now, yes, he testified to my foot was feeling uncomfortable. But feeling uncomfortable is not a cumulative trauma case. And since the interval between November 23rd and December 12th, there was nothing found essentially wrong with his left foot and ankle. So if he's going to use a cumulative trauma theory, what is the interval of time we're talking about for cumulative trauma? Wasn't it the entire time he worked there according to the doctors? That's what the doctors bootstrapped it up to. It's hard to tell who's bootstrapping, you know. Because he could have filed an application. He could have filed two applications. He could have filed one for November 23rd when he first experienced the problem. He chose not to. He could have amended the application for adjustment of claim to conform to the brief. He never did it. Well, he had to allege a date of accident. And if it was cumulative trauma, that would be the so-called manifestation date. Right. The manifestation date was November 23rd. Well. Yes. By any stretch of the imagination, by his own testimony, it's November 23rd, no other date. Is he bound by whatever date he puts in the application for adjustment of claim? I think he's bound. Or is the commission bound? Can't they find a different manifestation date? I mean, if you read the manifestation cases. Yes, I have, Judge, and I've been exposed to that, unfortunately. My theory, though, is that here is a young man with a college education, a degree in finance, and attended law school. He knows the manifestation date. He knows that when he went off to work on November 23rd, 2007, his foot was swollen. That's his date. He can't plead ignorance. What is the purpose of filing this? Why don't we just leave this blank? Why don't we just leave it blank and let the man come in and testify, and then at the end of the case, the arbitrator can pick out an accident date? Let's do that. That makes about as much sense as what he's done here. There is absolutely no justification for that. You just can't. You can't do it. By his own testimony, at the close of his proofs, he should have amended the application and say, oh, no, my incident date was November 23rd, 2007. But he chose not to. And you can't just say that's the last date. It doesn't fit in with the cumulative trauma theory. His manifestation date is November 23rd, 2007. So as a matter of law, he did not prove a prima facie case for an accident occurring on this date. By any stretch of the imagination. Now, is there any other question on that? Well, are you familiar with any case law that says if the petitioner fails to amend his application for adjustment of claim, if the arbitrator finds a different manifestation date, then he loses? No. There is some of the more modern, I'm going to call them, decisions that have come down from this court have indicated that there is almost a sua sponte date for an accident. But I think it has to have some semblance of reality to what the facts are. And in this case, it doesn't fit. In other words, you could change the theory of the case from cumulative trauma to specific loss or specific loss to cumulative trauma. But I don't think you have a right to create a new cause of action. I just can't see that you can do that. This man is absolutely 100% clear on his two dates. And had the arbitrator not asked that question, he would have probably said, well, it's 2012-2007, and it would have gone without notice. The arbitrator asked the question. Now, moving forward, as you note in the arbitrator's ward, there was a substantial amount of benefits paid. I think they were paid improperly. I do not accept the sins of my father, but I will stand here to defend him. Now, let's move on to what's really the key of this case was his ability to work, the treatment, and the particular pathologies which have been identified. There are a myriad of doctors in this case, both podiatrists and regular surgeons. Counsel in his brief, and he will stand before you and tell you about Dr. Lee. Simon Lee is a wonderful man. He continues to refer to him as the respondent's doctor. He's not. He's a doctor licensed to practice in the state of Illinois. He was chosen to do an examination. And since the doctrines of Nolo and Keystone are no longer in existence, and since the Kraft Food case, he's not a doctor for purposes of admission. He's a doctor for purposes of expressing an opinion. And his opinions were that based on what the gentleman told him, that his work activity could have been a causative factor in creating a problem with the foot and in the tibial tendon. Why is that important? One of the problems in the decision of the arbitrator is finding the relationship existed between the petitioner's pathology and the tibial tendon and the need for surgery. So in order to clearly evaluate, the next point of my theory is this. As we proceed through the medical records, we notice the following. We notice that the petitioner was seen on a regular basis by Dr. Lee. But prior to seeing Dr. Lee, he was also seen by a Dr. Miller. Dr. Miller saw him on February 29th of 2008. This is part of petitioner's exhibits. Again, he said, I first noticed pain November 23rd, 2007, after work. But he does not remember any particular trauma. Now, however, he noticed the pain again on December 12th while working. Again, this goes back to the December 12th date. He knows that's what happened when he was going down those stairs. He's again proving my theory it's a definitive date when that happened. Now. Counsel, your time has expired. Okay. You'll have time to reply. Thank you, Judge. I will address the medical issues on that if I was on time. Thank you. Counsel, you may respond. Thank you, Your Honor. May it please the Court and Counsel, I'm Ian Elfenbaum. We represent Brian Albizaz in the matter. Just by way of background, this is before you. It's been affirmed on all issues all the way up. The only matter that has switched back and forth is the award of penalties and fees. The arbitrator found a repetitive trauma accident but did not award the penalties and fees, quote, because there was cause for pause. Subsequently, the commission reversed on the penalties and fees in a two-to-one decision, finding that the behavior of the respondent in this case is objectively unreasonable. The dissenting commissioner concurred that this was a repetitive trauma accident but felt that penalties and fees were unwarranted. Then in the circuit court, the substantive issues were again affirmed, but Judge White felt a totality of the circumstances test was grounds to reverse the penalties and fees, and that's why we cross-appealed, and that's why I'd like to reserve three minutes, depending on the counsel's response. What about the special question that he is continuing to allude to is that you have alleged a specific injury on a specific date. Well, you can make up the record. I mean, this was a repetitive trauma case from day one for us. It was a repetitive trauma case in the five reports they received from their examining doctor, not one, not two, five, in a six-month period. And I would assert to you that's pretty rare for what we do, to get five attempts at changing your own doctor's opinion. Then they went and got a sixth opinion, which called it an exacerbation. It was always a repetitive trauma accident. But because counsel has continued to assert this single incident, the commission wrote, it's really both on an increased risk theory. So why they awarded penalties is because, well, they acknowledge that everything that Mr. Albazaz said is true, but they would like to create a legal argument that he didn't fit himself into a box to get compensability. But they failed on that regard as well, because here's a young man, he's a waiter, and he testified several times to repetitive pain. He wasn't perfect, he wasn't consistent. That's not what Durand requires. In fact, he fit within the framework of the flexibility test of that decision. So he said when he got to work, I was uncomfortable in my ankle in the beginning of the shift. As the evening progressed, my ankle got worse and worse. I started to limp. These are classic repetitive trauma type complaints. This is how he presented the case to every doctor who saw him. So why did the commission write penalties? Because no matter how you present a defense to this, it's objectively unreasonable to come in and say, well, he got hurt at work, we know that. We want to argue that we don't owe it anyway. We want to argue we don't owe it anyway because you made an error on your application, even though we all know that in repetitive trauma that's a flexible date. They want to argue, well, it's a neutral risk. No one presented that theory. It was increased risk, repetitive trauma running together. So the first instance where penalties was awarded was the cutoff of benefits in August of 2008. Now, he pointed out that I had just filed my application. Up until that time, the petitioner was paid and doing everything asked of him by the carrier. In addition to the five opinions of Dr. Simon-Lee that this was a repetitive trauma case and that he could not go back to his work as a waiter, his benefits were summarily terminated. Why? I'm still asking that question. So we filed an emergency petition. We put a penalties motion on. We came to the hearing. A light-duty job was offered. Within the restrictions, they acknowledge existed from all the physicians. So what happened to the period where they owed that worker's comp? Why did they not pay? He hadn't even seen his surgeon yet. It was just a summarily rejected defense into the case. So we soldiered on. He started working light duty. He got some temporary partial benefits. He saw Dr. Pinzer, who said he needs a surgery. He said he needs a surgery based on his physical exam, using the same MRI that had been done the day after he saw his podiatrist in December of 2007. Respondent chose to challenge that opinion. They went and saw him. He saw another doctor, Dr. Kalicki, and said, Well, I don't think he needs surgery. He needs an FCE and an ultrasound. So why does he need an ultrasound if he doesn't need surgery? And he didn't release him to work if he's ordering an FCE. Respondent terminates the light duty, doesn't pay TT, doesn't authorize the surgery. Okay. I don't understand the first two parts, but they have a dispute about the surgery. Dr. Pinzer does the surgery in April and finds a complete tear, complete detachment of the ligament. At that point, it's sort of hard to argue he didn't need the surgery, even if you have a physician who says, I don't think he needs surgery. He needs an ultrasound, which is to further explore that pathology. So now we've had a surgeon go in, look at it, repair it. He writes a letter explaining that he believes it's a repetitive trauma injury. Petitioners exhibit three. It's admitted. No depositions are taken. The commission relies on that, finds compensability, and awards penalties because there's still no objectively reasonable defense to all the evidence put in the record. No witnesses are called to challenge the petitioner. They had three people in the room. The arbitrator even asked, do you want to call any of these witnesses? No. So he's telling the truth. The medical is completely one-sided. Rather than pay the claim, and I'll admit to you claims can be disputed, but here with a total of six reports, before the treating, just using their medical, before our medical, really didn't have anything to argue with. That's why the commission wrote penalties, and they're pretty clear about that. The first sentence in their decision is, we see the facts differently. And they remove any argument about a neutral risk type theory, and they further move to reason that without an objective defense, there's nothing here for a respondent to rely on. I don't have any further argument, except to ask you to affirm the commission on all fronts, and I appreciate the reserve of my time. Thank you, counsel. Thank you, Judge. Briefly, again, going back to the issue of why surgery was not authorized and the petitioner's ability to return to work, I call your attention to the February 29, 2008, report from one of the seven treating physicians the petitioner chose, Dr. Miller, who found, and I quote, an examination of his left foot is neurologically intact, there are no lesions. Today he has absolutely no pain on palpation with range of motion across the course of the posterior tibial tendon, which is the one that was operated on. Subsequently, counsel asks you to look at Dr. Simon Lee. Dr. Simon Lee receives the report of the ultrasound, or the diagnostic studies, that is, of the posterior tibial tendon, which demonstrates a completely normal study on April 30, 2008. Not satisfied to demonstrate that, the petitioner then undergoes a functional capacity evaluation by orthophysical therapy, which is in evidence as petitioners exhibit. It shows the petitioner was completely cooperative during the course of the evaluation and that his physical limitations were heavy physical demands characteristics of work. Now, he had a complete job description, which is also in the sports medicine records, and here was, that was given to Dr. Simon Lee. Dr. Simon Lee said, I have seen video surveillance of this gentleman, I have seen the physical capacity evaluation. However, I think he does fit within the physical demands of the heavy. However, I am concerned that if he goes back to work, he may not be able to work for a prolonged period of time, et cetera. That doesn't mean he can't work. It means he can work, but if problems arise, he should come back. That's what that means. It doesn't mean he can't work. So he looked at the physical capacity evaluation and suggested, I'm a little concerned about it, but it is what it is. He says, I would give him some restrictions, but the physical capacity evaluations do not do that. And that was effective on June 20th of 2008. Moving along to August of 2008, on August 11th and August 25th, the petitioner in a period of less than a week saw two different doctors, Dr. Brian Tulin, and most importantly, he saw a Dr. Perns, P-E-R-N. I want to read you something from Dr. Tulin's report dated August 11th, 2008, and I want you to consider if you went to a doctor and he told you this, what would you think? The conclusion on page 2, August 11th, 2008, because of the fact that the posterior tibial tendon at the time of that examination was normal. He found no subluxation. Here's what he tells this person to do. He says he is also scheduled to see Dr. Michael Pinzer next month and recommended that he aggravate his current condition to help Dr. Pinzer make a better evaluation. Mr. Albizaz understands this treatment plan. Now, if you were a patient and you didn't know whether or not you needed surgery, and you went to this doctor who told you that he suggested you aggravate your condition so we'd get a better picture of whether you need surgery or not, for heaven's sake, what would you think? Well, I, representing the respondent, would never, ever, ever tell anybody to pay for that surgery based on that report. Now, if every test that was done up until the time of Dr. Pinzer's surgery for that posterior tibial tendon showed a tenosynovitis, it did not show anything, it was a subluxation with a tenosynovitis. When surgery was done, it showed a complete rupture in 2009. Well, who knows, based on what Dr. Tolan told this man to do, what happened in that period of time. I'm not saying Dr. Pinzer didn't find a complete tear. Of course he did. He did an osteotomy, he did an iliac bone crest transposition, and he repaired the ligament. But by the doctor's own testimony in 2008, it wasn't there. By the MRI study, it wasn't there. Pinzer found it. I'm not saying he didn't find it. But, to further build belief, Dr. Pinzer then says, regarding the issue of whether it's related, Dr. Pinzer, in his notes, which are counsels in evidence, on May 21st, 2009, at or approximately, I'm guessing here, at 4.30 p.m., I would think, it says, this is subsequent to the surgery, it is noted there were discrepancies in the record about the mechanism of the injury. Kathy Gonzalez entered correct history. Injury seen at surgery was consistent with a single injury, an avulsion of the posterior tibial tendon with a rupture of the spring ligament. A single incident of trauma. That was never found prior to the date of that surgery. That's in counsel's own exhibits. Okay? Now, counsel then writes to the doctor. And he says, letter to Mr. Elfenbaum from Dr. Pinzer. Dear Mr. Elfenbaum, this is petitioner's exhibit, letter dated September 17th, 2009. I received your letter September 8th. Mr. Elbazs has stated he developed a foot pain after multiple small injuries versus a single incident. There's no testimony of multiple small injuries. None. May it please the Court. First of all, the case did not establish a compensable injury on or about December 12th, as the application for adjustment of claim states. The petitioner did not have any surgical necessity following this incident until it was found in 2009, and that is after every doctor that saw him found nothing more than a posterior tibial tendonitis. And every MRI and the ultrasound studies were normal for any tears in the posterior tibial tendon. Would I have paid compensation on this case? Never. Would I have paid for this surgery? Never. I am stuck with what I have. Benefits were paid. But no further benefits should be paid. No penalties should be paid. No additional temporary total disability should be paid. I thank you for the privilege of being here today. Thank you, counsel. Mr. Blunt. Just as a reminder, this is a manifest weight case, counsel's passion aside. The FCE was inaccurate only because no job description was ever provided. That's in the record. So when Dr. Lee said he could try working, it was very clear no one was suggesting he could be a waiter full-time, ever. And as far as Dr. Pinzer's opinion, well, we wrote to him to clarify what he wanted, and he responded. And that's in evidence that the commission relied on. It's a completely valid exercise in their fact-finding ability. The MRIs were not normal. They just didn't show a tear. That's why all these seven doctors continued to treat him. That's why his physical therapy failed. He had a tear. It just didn't show on the MRI. That's why we asked for penalties once the surgery confirmed it, not before. Lastly, I just direct you again to the Durand case on any issues of compensability in a repetitive trauma case. Thank you, counsel. In this statement here, I'm looking at counsel's exhibit. Counsel placed into evidence the records with the functional capacity evaluation immediately behind it. The functional capacity evaluation was completed June 18th and June 20th. On June 16th, at approximately 11.44 and 59 seconds, the insurance company or the employer, someone, asked to the doctor the complete job description, and that's all they had. And that's why that sentence in this report, in paragraph 3, says, I requested more information and was told that's all they had, meaning the job description I sent. Okay. Thank you. Thank you, counsel, both, for your arguments in this matter this afternoon. This hearing will be taken under advisement and a written disposition shall issue.